**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **BRANDY CONNER, M.D.** | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO: 4:21-cv-00700 |
| | § § | |
| **TEXAS RADIOLOGY ASSOCIATES, LLP** | § § § | |
| Defendant. | § | JURY TRIAL DEMANDED |

**ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff Brandy Conner, M.D. ("Plaintiff" or "Dr. Connor") complains of Defendant Texas Radiology Associates, LLP ("Defendant" or "TRA") and for causes of action would show the Court as follows:

**I.**

**INTRODUCTION**

1.01   Plaintiff brings this action for sex discrimination, sex harassment, and unlawful retaliation under Title VII and Chapter 21 of the Texas Labor Code.

**II.**

**PARTIES**

2.01   Plaintiff, Dr. Conner, at all times relevant herein, was a U.S. citizen and resident of the State of Texas. Plaintiff resided at 15288 Ridgewood Drive, Frisco Texas 75035, and may be reached through the undersigned counsel.

2.02   Defendant Texas Radiology Associates, LLP, is a limited liability partnership organized under the laws of Texas. Defendant's principal offices are located at 1820 Preston Park

Boulevard, Suite 2400, Plano, Texas 75093, with other offices throughout Texas including one at 4700 Alliance Boulevard, Plano, Texas 75093. Defendant may be served through a board member, a partnership member, an owner, or an officer of Defendant, wherever found.

## III.

## JURISDICTION AND VENUE

3.01   Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, and pendant and supplemental jurisdiction of the common law claims.

3.02   Venue for all causes of actions stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. § 1391. This Court also has pendent jurisdiction over state law claims.

3.03   Plaintiff timely filed her charge of discrimination with the EEOC and Texas Workforce Commission. Plaintiff is filing this complaint within 90 days of her receipt of the Notice of Right to Sue from the EEOC.

## IV.

## FACTUAL ALLEGATIONS

4.01   Plaintiff was hired by Defendant on January 8, 2018 to be a physician at Respondent's facilities in Frisco, Texas. Plaintiff's full-time start date was supposed to be July, 2018, but was delayed to November, 2018. When Plaintiff reported to work. she was assigned to Defendant's Baylor-Plano site. Plaintiff's immediate supervisor was Dr. John Bondy, ("Bondy") who is Defendant's Site Director, Board Member of Human Resources, Senior Partner and President/Co-Owner.

4.02   Fresh out of training, Plaintiff moved herself and her children to Texas for her first job, which happened to be with the Defendant. At Defendant's direction, Plaintiff purchased a home

and worked in good faith for the company, performing work-related activities even prior to her start date.

4.03 The gender inequality at TRA is largely centered among a few male senior partners and Susan Spain, the female practice manager. Plaintiff was hired at the exact same time as her partner, Dr. Do, who is male, and has the same level of education and work experience.

4.04 Unlike Plaintiff, Dr. Do was treated professionally, paid fairly for his time, and had a drastically different experience with TRA. For instance, Plaintiff and Dr. Do attended the exact same orientation presentation by Defendant. Dr. Do was paid for his attendance, but Plaintiff was not.

4.05 This type of inequality occurred numerous times during Plaintiff's employment, including, but not limited to, onboarding, completing work after hours, and performing administrative duties.

4.06 Over the course of six (6) months, Plaintiff performed a minimum of 299.5 hours of uncompensated work for the Company, all in good faith as a long-term investment working for TRA.

4.07 Plaintiff was initially denied health benefits, which Defendant promised would be in place at the outset of her employment. She was frequently not informed of changes to her work schedule, and had her benefits terminated early. Meanwhile, Dr. Do was provided the contracted benefits promised, and without Plaintiff's knowledge, had senior partners ask him for permission to make changes to Plaintiff's schedule, as documented in text messages.

4.08 Plaintiff was undermined in both her work schedule and "call compensation". Consequently, Plaintiff was not being credited productivity revenue accountability for call shifts. As a result, Plaintiff was never compensated for work normally valued at $60,000.00/year, as stated in an email from senior partner Dr. John Kim, and noted in Defendant's compensation price list.

4.09 Even though Plaintiff was the most up-to-date physician in breast imaging, she was

oddly excluded from breast imaging subcommittee meetings, and left to do email responses to new protocols that were not aligned with national standards. Plaintiff's emails often went unanswered. Defendant's management frequently declined to refer to Plaintiff by her proper title. For example, when present in a group with the practice manager, Dr. Do would be addressed as "Dr. Do.", but they would address or refer to Dr. Conner as "Brandy".

    4.10    At one point, Plaintiff directly clarified that she was a physician, a single woman, and not Dr. Do's wife. These were not isolated incidents, but were documented in multiple emails. In another meeting with Bondy, one of the Company's Presidents, Plaintiff was referred to as "sweetheart", and Bondy patted her on the head in front of other doctors.

    4.11    The gender inequality and bias microaggressions in the Company are not unique to Plaintiff. A number of women who have also worked with Defendant admit to dealing with their gender bias, but were forced to accept the hostile work environment because they needed the job. Defendant is one of the only private practice groups in Collin County and essentially dominates this specialized area.

    4.12    One woman admitted to pumping breastmilk on the floor of a janitor's closet because there was no area to pump, and she would be let go or "given hell" for taking additional breaks to pump, so she wouldn't eat lunch, and she tried to minimize her bathroom breaks to once a day.

    4.13    Female physicians were frequently told they were not good enough because they are 'slow'; Defendant actually forced a female employee to personally pay other physicians to work her call shifts, refusing to allow her to work the days she was due per her contract, while also threatening to make her pay additional money to the partners beyond the dollar amount the shift work paid, because her slowness caused 'partners to have to work more'.

    4.14    Another woman admitted to working in fear because she was forced to "work faster" which meant she would be less detailed in evaluating patients and limited calling critical findings to

minimize time on the phone, risking her medical judgment to try to decrease the negativity from Defendant's senior partners.  Meanwhile, the senior partners and Dr. Nguyen [wife of Dr. Kim, senior partner], are the only physicians who regularly staff sites with administrative assistants who make phone calls for the physicians and relay critical results.

4.15     Female doctors are frequently criticized for being 'slow' or needing to 'increase speed and number of studies', while male colleagues who have been senior partners in the Company for decades and practice at a significantly slower pace are without any criticism.

4.16     In the private physician owned company consisting of more than 140 physicians, only one (1) senior partner/President is a female physician. The female physician breast imaging specialists are consistently not given the title of "Medical Director" at their assigned institutions, even though they perform all the duties of this position.

4.17     The female physicians are the physician on staff at least 80-90% of the time at each specific institution, and are more qualified than their male peers who were assigned directorship.  In fact, many of the men who are assigned as medical directors of women's imaging centers, provide false information about fellowship training and continue to falsely represent themselves on Defendant's website.

4.18     This practice creates a large financial benefit to the partners of the group, as the women do nearly all of the hands-on clinical work and administrative duties, while the Defendant's partners are paid large sums of money for the director role by the healthcare corporations with whom Defendant contracts. The additional $80,000 -100,000/year reimbursement gain for each of these contractual relationships is never passed along to the women physicians performing the actual work. Instead, it is dispersed among the predominantly male partners.

4.19     Plaintiff attended all of the medical director meetings for the Baylor Plano Women's Imaging Center, including monthly meetings with the BSW Senior Vice President, Chief Financial

Officer, and Executive Directors.  Plaintiff performed administrative duties in bringing the BSW Plano WIC up to the current standard of care, training employees, and even accepted an award from the Plano Chamber of Commerce on behalf of the BSW Plano WIC, attending the ceremony in person in January 2019 at the request of the President of Baylor Hospital.  Plaintiff received no compensation for these administrative duties.  Instead, Bondy and the TRA senior partners took credit and full compensation for those activities.

4.20     Male physicians can get assistance in changing schedules for flexibility around unexpected schedule disruptions, however, as documented in emails, female physicians do not receive the same assistance.  For example, a female physician was scheduled at a hospital where she could not legally work; when asked about the apparent error, Defendant responded "it's your [female doctor's] problem and you should figure it out".

4.21     Emails from seasoned physicians in the group direct the newly hired female doctors to "keep quiet, or Susan [Ms. Spain, the practice manager] will make your life hell" and "avoid talking to Susan if possible, she gets anything she wants from the partners and holds grudges with a vengeance." "There's a reason John [Kim] says they call her a bulldog".  This has resulted in a lack of accountability for the practice, and a fear of retaliation for speaking up against such treatment.

4.22     When Plaintiff joined the practice, she received and reviewed the physician handbook. To her dismay, she discovered that there was no Human Resources Department or Human Resource Manager.  All inquiries and concerns were to be brought to the attention of a senior partner, or Ms. Spain.

4.23     Consequently, Plaintiff had no safe way of reporting concerns or mediating issues that involved a senior partner or Ms. Spain.  As will be more fully described below, Plaintiff was sexually harassed in the workplace, but there was no Human Resources office to which she could reports this conduct.

4.24 When Plaintiff did report that she had been sexually harassed to the partners in the group, drastic changes were made to her schedule wherein she was forced to work extra hours and even an extra holiday without pay.  This was subsequently followed by her summary termination weeks later.  The temporal proximity between Plaintiff's protected activity and subsequent termination lead to the inescapable conclusion that she was the victim of unlawful retaliation in violation of title VII and Chapter 21 of the Texas Labor Code.

**1.    Sexual Harassment of Plaintiff in the Workplace.**

4.25 Bondy had pet-names for female physicians.  He called Plaintiff "Sweetheart" or "Goldilocks".  He would also address the Director of Breast Imaging for BSW as "Aunt Janis". Bondy marginalized Plaintiff and made her uncomfortable immediately.  Enduring this behavior for the first few months as a new employee at TRA, Plaintiff told other professionals of her situation and realized that Bondy's actions were indeed sexual harassment.

4.26 In the first incident, Bondy placed his hand under the table during a business dinner, resting his hand on Dr. Conner's partially exposed thigh while he asked: "Are you enjoying your dinner?"  Plaintiff, wearing a black cocktail dress, quickly tried to cover her thigh with her napkin and dress, and responded while trying to hide her shock and discomfort in the moment.

4.27 After the dinner, Plaintiff told her partner, Dr. Do, about Bondy's behavior.  Dr. Do pointed out that the group consists of more than 120 physicians, so the likelihood that she would have to work with him was remote.  Plaintiff chose to consider the event that evening as a one-time incident.  It was soon apparent, however, that this was one of several targeted sexual advances.

4.28 Plaintiff was unaware of Defendant's internal partnership structure and did not know the degree of control that Bondy would have over her.  He made her schedule, he decided how she would practice her specialty, and he reminded her that he was the senior partner/President and was therefore in charge of controlling all of breast imaging.

4.29     Plaintiff's first day of employment was a shock, as she was completely alone without anyone to familiarize her, no backup or computer training, and she had an overbooked patient schedule.  Plaintiff was completely overwhelmed by the absence of training and support on her first day, which put her drastically behind for the next day and entire week, but according to other newly hired physicians, this was atypical.  Months later, Plaintiff was informed by a senior partner that her first weeks of employment were set up that way at the direct request of Bondy.

4.30     During Plaintiff's first few weeks on the job, Bondy also did the following:

1. Offered to work side-by-side with Plaintiff, even though there was only one workstation;

2. Offered to bring Plaintiff lunch at the workplace;

3. Requested that Plaintiff watch him perform breast exams on patients;

4. Expressed disgust when Plaintiff tried to speak about updates in current practice parameters or point out deficiencies in the Baylor system that concerned her.

4.31     It was apparent that Bondy was neither interested in helping her bring the center up-to-date, nor complete the work that was pending, but instead seemed to look for any excuse to be in close proximity to Plaintiff while exuding power and dominance over her as her superior.

4.32      In November and December 2018,  Bondy made surprise unannounced visits to Plaintiff's workplace "after hours", when he knew she was alone.  Bondy did not perform work or complete cases during these nighttime surprises, which can be verified by the time-stamped reports in the Baylor system for the dates in question.

4.33     The first surprise visit was within days of Plaintiff's starting her new position at Baylor Plano.  He arrived around 8 p.m.. The lobby doors were locked, and the staff had gone home for the night.  Entering through a back security door, Bondy walked into the dark office and startled

Plaintiff.  She was immediately uncomfortable.  After making small talk, Bondy proceeded to ask Plaintiff where she lived, what kind of wine she enjoyed, and if she'd like to go to dinner sometime as he offered to "show her around".

  4.34 Plaintiff made her way towards the door and Bondy followed her as he explained "I was going to come up here and help read some cases, but my eye has something going on, so I'll just walk out with you."  While walking out, Plaintiff apologized that he had taken time out of his night to come in, to which Bondy responded "The pleasure is mine.  I live within 10 minutes from here, so I can easily come in at any time to see you".

  4.35 Plaintiff pointed out to Bondy that his wife likely wants him at home since it was almost 9 p.m. and he responded "She's fine alone. And I'd like to get to know you better, where did you park?" as he gestured to his car right in front of them.  Plaintiff felt fearful and intimidated.  Pointing to the parking garage, Dr. Conner hurried off, insisting she didn't need him to walk her to her car.

  4.36 Once she arrived at her vehicle, out of sight from Bondy, she locked herself in her car and immediately called Dr. Do to relay what happened, how she felt threatened by him "like he was going to do something sexual to me", and asked if she was overreacting since she felt so vulnerable.  Knowing Bondy's power over her job, Plaintiff and her partner decided that Plaintiff should ask the partners and Bondy that she be made aware of any nighttime visits in advance, and that another person be present if possible.  Despite this request, Bondy continued to make unannounced visits in the evening, and engage in the same awkward small talk, rather than constructive, work-related discussions.

  4.37 Plaintiff tactfully reported this incident to the partners, and in an email to the partners, including Bondy, she requested that meetings occur during business hours or be scheduled in advance and that an additional person attend.

4.38 After Plaintiff made that request, she quickly realized TRA had not given her health benefits as she was promised. She contacted Ms. Spain, who said there was nothing they could do about the lack of health benefits, and that Plaintiff would have to wait 30 days, although benefits were promised starting on day one of employment.

4.39 Plaintiff informed Ms. Spain that not only was she violating the contractual benefits owed, but that she had also not been afforded onboarding for her clinical site, beyond the days she had attempted to observe, which had still not been paid. Worried the benefits issue was retaliation for asking to not be alone with Bondy at night, Plaintiff's fears were confirmed in December 2018 during another nighttime visit.

4.40 Although Plaintiff was again surprised by an unannounced visit from Bondy, this time it occurred earlier at 6 p.m., and he was accompanied by another breast imager, Dr. Gaylon "Cory" Morgan ("Dr. Morgan"). This is the first time Plaintiff had met Dr. Morgan. The two men sat down across from Dr. Conner and Dr. Bondy proceeded to talk. Dr. Morgan warned Plaintiff to be "careful" in how she talked to Ms. Spain and the partners because they "have a lot of power". Plaintiff asked why she wasn't given benefits on the first day of employment, as promised?"

4.41 Plaintiff explained that she needed health insurance coverage for immunotherapy she took biweekly. She explained that she would have gladly continued her Emory COBRA coverage for an additional month if needed, but had canceled coverage upon starting with TRA, as she was told benefits started on the first day.

4.42 Bondy raised his hand in the air to stop Plaintiff from talking as he said "I don't want to know your health issues. I am just here to make it clear you understand that certain people have a lot of power in this Company and maybe you should be seen and not heard for a little while." Plaintiff apologized for being assertive and stated, "I am only asking for what I was already promised, no more and no less."

4.43    Dr. Morgan chimed in at that point and asked about the breast center workflow and if there were any issues or concerns.  Plaintiff pointed out that there was inconsistency in how exams were handled, it was inefficient, understaffed, and it is not what she was told or saw during her interview and observations.  Dr. Morgan confessed he had never worked at Baylor Plano's breast center, but knows it has a "history of chaos."  Bondy quickly shut down the conversation and stated that both of them would try to "help if needed".  Plaintiff knew this was an empty promise, since no other physician was able to see the exams outside of that room.

### 2. **Plaintiff Reports Dr. Bondy to the Partners**.

4.44    Because of the situation with Bondy and her growing distrust in TRA's ability to resolve this matter, Plaintiff went to the Baylor Plano Hospital Executives in February 2019.  She met with Dr. John Marcucci ("Dr. Marcucci") to discuss her concerns in the breast center and its two BSW administrators' leadership.

4.45    Plaintiff briefly expressed her unease with Bondy to Dr. Marcucci, who agreed that Bondy is sometimes a little 'different', but that he thought he was harmless.  Dr. Marcucci promised Plaintiff to help her get the breast center on track and stated the two BSW administrators over the Baylor Plano Breast Center, Janis Roberson and Phyllis Burton, had severe power issues, specifically with female physicians it seemed, as it was not the first time a physician reported concerns about them.  Dr. Marcucci applauded Plaintiff's perseverance and assured her that TRA would be made aware of the issues.  He did not want Plaintiff being a scapegoat for the center's shortcomings or the two administrators' problems.

### 3. **Defendant's Awareness of Dr. Bondy's Behavior**

4.46    By late February/March 2019, Plaintiff was avoiding Bondy as much as possible due to the hostile work environment.  This affected her daily work, as the breast center continued to have staff issues and the two BSW administrators talked with Bondy directly, excluding Plaintiff from

discussions and decision making.

4.47  Plaintiff asked another senior partner at TRA, Dr. Steven Reiman ("Dr. Reiman"), if he could be of help with the two BSW administrators, because she was very uncomfortable with Bondy who made her feel unsafe and exploited.  Dr. Reiman stayed very positive at first, as he was helping get the breast center schedule changed for a trial period, getting IT support for off-site review of images, and even gave Plaintiff positive professional feedback. Dr. Marcucci had discussed the situation with Dr. Reiman, and Plaintiff believed her situation was going to drastically improve as long as she could ignore and avoid Bondy.  On April 10, 2019, in a meeting about the breast center, Plaintiff described to Dr. Reiman about the awkwardness of prior late night surprise visits, pet-names, and touching from Bondy.  Dr. Reiman brushed off the advances, saying "he's odd, just ignore them", however, Bondy was still Plaintiff's direct superior and he was a more senior partner and co-President over Dr. Reiman.

4.48  Within days after Plaintiff reported her concerns to Dr. Reiman, Bondy started changing Plaintiff's schedule and having her visit other sites contracted with TRA.  Dr. Reiman suggested this was good, saying Plaintiff should see the other sites and how they operate so she could better help Baylor, or maybe even decide to staff a different site.  Dr. Reiman admitted "normally all of our new hires rotate around many sites before we isolate them at one place, but Bondy had requested we not do that with you, and I don't know why, but I think it will be good." Initially, Plaintiff was thrilled to work at the sites she was shown on her interview and thought she'd perhaps get the site she was initially promised during her interview, a brand new hospital in Frisco.

4.49  Seeing other sites, Plaintiff realized the other breast centers had a true staff, including a breast sonographer and nurse navigator.  The dysfunction at BSW Plano WIC and sites under the two BSW administrators, including understaffing, micromanagement, and refusal to perform maintenance, were unique, and likely explained why no one else in the 120+ physician TRA

company wanted to cover that site.

4.50 While rotating at other sites, Plaintiff met another partner of TRA, Dr. Samuel La ("Dr. La"). On April 29, 2019, Plaintiff told Dr. La about the hostile work environment with Bondy, his unwanted advances and the abrupt schedule change after she reported him to Dr. Reiman. Dr. La responded "he [Dr. Bondy] is a weird guy, you're not the first one and you won't be the last, just ignore him". Plaintiff confessed "I can't ignore him when he controls everything about my job". Dr. La acknowledged the situation and said "I hope it gets better. We all want you to be successful here."

4.51 Within a week of reporting Bondy to Dr. La, Plaintiff was assigned to a hospital and breast imaging center in Denton, Texas, a two-hour commute from her home every day, and a site where she was not performing only breast imaging, but would also read every other type of general imaging exam, and perform procedures. Being one of the only mothers in the pool of breast imagers, Plaintiff was frustrated her schedule was not rotating or working closer to her home or at the location TRA had hired her for. Instead, it was day after day of driving over two hours to work and home. With two children in school, this made a difficult morning and afterschool pick-up/drop-off routine, and prevented participation in nearly all parent evening activities at the school.

4.52 In an email to Dr. Reiman, Plaintiff asked how long she would be at the distant site, because it really made things difficult with her children at home. Dr. Reiman informed Plaintiff that it was up to Bondy, as he makes her schedule, and she needed to talk to him if she had questions. The abrupt change in Dr. Reiman's willingness to help concerned Plaintiff.

4.53 That evening, Plaintiff discussed her concerns with Dr. Do, who reassured her that he trusted Dr. Reiman and although she was very concerned about losing her job after reporting Bondy, Dr. Do stated "everyone knows he's a little off, they don't blame you, it is not your fault. You are a great doctor, have faith in this Company, please." One of the new partners is at Denton, Dr. Mike

Maiers, he seems like a good guy, follow his lead."

4.54 Plaintiff interacted with Dr. Maiers regularly and she trusted him. She reported Bondy's actions to him, explained the rapid schedule change after she first spoke about it to Dr. Reiman and then Dr. La and now her distrust of the partnership after them poorly handling the situation. Dr. Maiers sympathized with Plaintiff, admitting she was young, and this was her first job, so she was allowed to be a little naïve. He even offered up his own experience. He confided it took longer than expected to become a partner at TRA, but reassured her that overall, it was a good place to work. Dr. Conner felt a sense of relief because, even with the hardship of a long commute, she no longer felt fearful walking into work every day.

### 4. Termination of Dr. Conner.

4.55 On June 19, 2019, at 5 p.m., Dr. Kim texted Plaintiff to notify her he was about 30 minutes late. Soon, Plaintiff was greeted by Dr. Kim and a young woman who shook her hand briefly while pulling out a single sheet of paper from a manila envelope, saying "Hi, I am De Andra. I am the HR Manager for TRA. I am just here to get your signature on this paper, this is your formal notice of termination, and it says you have 90 days to complete your work with TRA, but your health insurance and benefits will be canceled at the end of this month."

4.56 Shocked and at a loss for words, Plaintiff signed the paper, while wondering how long this woman had been employed by TRA, if she knew about the sexual harassment and the issues Plaintiff had getting benefits, and how she was unpaid for the same paid activities as her male colleagues. In the whirlwind of surprise, Plaintiff did not even realize her health insurance was going to be canceled within days. De Andra stated that there would be COBRA paperwork emailed within the next 24 hours, then she quickly left with Dr. Kim.

4.56 Moments later, Dr. Kim returned to Plaintiff's office alone, and asked if she had any questions. Plaintiff replied: "Yes. I was told this was a meeting to discuss my productivity, but I

guess that was all a decoy?" Dr. Kim responded "Yes, I was actually also under the impression this was about productivity. I was told you only made the Company $900/day, but as you know, that isn't the case. I am just following orders. I was simply told to fire you."

4.57   Plaintiff pressed for more information, "Fire me? Without cause? This has nothing to do with my productivity, patient care, or quality of work, does it? I have all the numbers. I detect more high-risk lesions and breast cancer than anyone in our group. My cancer detection rate is 7.3, better than the national standard of 2.5. My minimal cancer detection rate is 93%, my sensitivity is 100%, my specificity is 98%. While I was at Baylor Plano, the volume increased, the breast surgeons and oncologists were happy, and now that I am in Denton, we are seeing the same thing. Volume is increasing. I am finding cancers others miss. The breast center staff is happy. I don't understand. Please tell me specifically what I did wrong so I can avoid the same mistakes in the future."

4.58   Dr. Kim replied "Being the best, being a good doctor doesn't write your paychecks. No one cares if you're good – if you're fast you will miss stuff, but the work is done and we, as a Company, make money. It's a business Brandy." Plaintiff clarified "I did make you money. More volume is more money. Please tell me this is not about Susan Spain being upset that I put my foot down for the health insurance I was due. Oh no, this is not about that is it? This is about me rejecting a senior partner!" Dr. Kim looked matter of factly and stated "People have long memories Brandy. He is one of the Presidents of the company. When he wants something done, people do it. I am sorry. None of the partners were willing to stand up to him for you. You have no one in your corner. He is a powerful man…. Maybe if you work extremely hard these next 90 days I would be willing to put my name on the line for you."

4.59   Plaintiff thanked him for his time and as he left he said, "I am sure Brian will want to discuss this, so I will call him tomorrow." As he left, Plaintiff was shocked that he asked her to

"work extremely hard these next 90 days", as if putting in hours of extra work for the Baylor site wasn't enough?  She realized the time away from her family and her dedication had been taken advantage of and they retaliated against her because of her gender and protected activity.

## V.

## FIRST COUNT

### DISCRIMINATION BECAUSE OF SEX IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000(E) ET SEQ AND CHAPTER 21 OF THE TEXAS LABOR CODE

5.01    The foregoing paragraphs of this Complaint are incorporated in this count as fully as if set forth at length herein.

5.02    Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f) Title VII and belongs to a class protected under the statute, namely females.

5.03    Defendant is an employer within the meaning of 42 U.S.C. § 2000e(d) Title VII, since it employs more than fifteen employees.

5.04    Defendant is also an employer within the meaning of Chapter 21 of the Texas Labor Code

5.05    Defendant intentionally discriminated against Plaintiff because of her sex in violation of Title VII and Chapter 21 of the Texas Labor Code  by creating a work environment hostile to women.

5.06    Plaintiff has timely filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") and the Texas Workforce Commission    On June 12, 2021, Plaintiff received her Right to Sue Letter dated December 31, 2020**.**  Plaintiff timely filed suit against Defendant within 90 days of her receipt of the Notice of right to Sue.

5.07    As a direct and proximate result of Defendant's conduct, Plaintiffs suffered the following injuries and damages:

    a.  Plaintiff suffered mental anguish and emotional distress, as well as loss of enjoyment of life, inconvenience, and general damages; and

    b.  Plaintiff suffered lost wages and related benefits.

5.08 Plaintiff is entitled to an award of attorneys' fees and costs under Title VII, U.S.C. §2000e-5(k).

5.09 Defendant violated Title VII and Chapter 21 of the Texas Labor Code by discriminating against Plaintiff in connection with compensation, terms, conditions, or privileges of employment because of Plaintiff's sex. Plaintiff was subjected to a continuous course of harassment, and worked in a sexually hostile environment.

5.10 Such discrimination by Defendant against Plaintiff was intentional. Accordingly Plaintiff is entitled to recover damages for back pay, front pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life and other non-pecuniary damages. Further, this discrimination was done with malice or with reckless indifference to Plaintiff's federally protected rights. Plaintiff is therefore also entitled to recover punitive damages.

## VI.

### SECOND COUNT

### <u>UNLAWFUL RETALIATION IN VIOLATION OF 42 U.S.C. § 2000(E) ET SEQ and CHAPTER 21 OF THE TEXAS LABOR CODE.</u>

6.01 The foregoing paragraphs of this Complaint are incorporated in this count as fully as if set forth at length herein.

6.02 Pursuant to 42 USC section 2000(E) *et seq*., an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who opposes a

discriminatory practice; makes or files a charge; files a complaint; or testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

6.03    The same provision is found in Chapter 21.055 of the Texas Labor Code.

6.04    Defendant retaliated against Plaintiff after she complained to Defendant about the unwelcome advances and sexually hostile environment in the workplace by terminating Plaintiff's employment.

6.05    Defendant terminated Plaintiff's employment on June 19, 2019.  Defendant's stated reason for Plaintiff's termination was for job performance.  This stated reason is a pretext for retaliation because Plaintiff had committed no wrongdoing, and because other employees who had engaged in similar conduct, were never disciplined or terminated.

6.06.    Defendant knowingly and willfully retaliated against Plaintiff for her protected activity in violation of Title VII.

6.07    Defendant's conduct was malicious and/or taken with reckless disregard for Plaintiff's rights.  It was foreseeable by Defendant that Plaintiff would suffer harm as a result of the retaliation and discrimination.

## VII.

## **JURY TRIAL DEMANDED**

7.01    Plaintiff demands trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover and the following relief against Defendant:

(1)    Judgment for actual damages in the amount of past and future lost earnings and benefits and damages to past and future earnings capacity;

  (2)  Judgment for back pay and front pay as allowed by law;

  (3)  Judgment for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses;

  (4)  Damages for past and future mental anguish, emotional distress and physical distress;

  (5)  Exemplary damages in an amount to be determined by the trier of fact;

  (6)  Prejudgment and Post-judgment at the maximum legal rate;

  (7)  All costs of court;

  (8)  Attorneys' fees; and

  (9)  Such other and further relief to which Plaintiff may be justly entitled.

Date: September 9, 2021.

              Respectfully submitted,

              **KILGORE & KILGORE, PLLC**

            By: /s/ Nicholas A O'Kelly

              Nicholas A O'Kelly
              State Bar No. 15241235
              **KILGORE LAW CENTER**
              3109 Carlisle
              Dallas, Texas 75204
              (214) 379-0827 - Telephone
              (214) 953-0133 - Telecopier
              nao@kilgorelaw.com

              **ATTORNEY FOR PLAINTIFF**
              **BRANDY CONER, M.D.**